**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| IN RE: GOLD KING MINE RELEASE IN SAN JUAN COUNTY, COLORADO, ON AUGUST 5, 2015<br><br>*This Document Relates to:*<br><br>*All Cases* | ) C.A. No. 1:18-md-02824-WJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## THE NAVAJO NATION'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANTS' EXPERT ROBIN CANTOR

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

LEGAL STANDARD...................................................................................................3

FACTUAL BACKGROUND ........................................................................................4

I.       Plaintiffs' Experts Calculate Damages Caused by the Spill .............................4

II.      Dr. Cantor Strays Beyond Her Expertise in Rebutting Plaintiffs' Experts.......6

ARGUMENT ...............................................................................................................8

I.       Dr. Cantor Offers Opinions Outside Her Expertise. ........................................8

II.      Dr. Cantor Offers Unhelpful Opinions that Invade the Provinces of the
         Court and Jury...............................................................................................13

         A.       Dr. Cantor Improperly Opines On Dr. Jones's and Mr. Unsworth's
                  Qualifications. ...................................................................................14

         B.       Dr. Cantor Improperly Opines About the Legal Basis for Damages.................16

CONCLUSION.........................................................................................................18

TABLE OF AUTHORITIES

**<u>Cases</u>**

*Am. Auto. Ins. Co. v. First Mercury Ins. Co.*,
    2017 WL 4410780 (D.N.M. Sept. 30, 2017) ................................................ 3

*Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC*,
    2006 WL 4060665 (D.N.M. Sept. 26, 2006) ........................................... 9, 11

*Conroy v. Vilsack*,
    707 F.3d 1163 (10th Cir. 2013). ................................................................. 3

*Cope v. Vermeer Sales & Serv. of Colo., Inc.*,
    650 P.2d 1307 (Colo. App. 1982) ............................................................. 17

*Dodge v. Cotter Corp.*,
    328 F.3d 1212 (10th Cir. 2003) .................................................................. 3

*Ellis v. Hobbs Police Dep't*,
    472 F. Supp. 3d 1087 (D.N.M. 2020) ...................................................... 13

*Frerck v. Pearson Educ., Inc.*,
    2014 WL 477419 (N.D. Ill. Feb. 6, 2014) ................................................ 14

*In re Williams Securities Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007) ................................................... 9

*Kehler v. Bridgestone Ams. Tire Operations, LLC*,
    2016 WL 8316771 (D. Wyo. Dec. 1, 2016) ................................... 2, 14, 15

*LifeWise Master Funding v. Telebank*,
    374 F.3d 917 (10th Cir. 2004) .................................................................... 8

*Martinez v. Continental Tire the Ams., LLC*,
    2020 WL 5943691 (D.N.M. Oct. 7, 2020) ............................................... 16

*Milne v. USA Cycling, Inc.*,
    575 F.3d 1120 (10th Cir. 2009) ................................................................ 11

*Montes v. Town of Silver City*,
    2005 WL 8163860 (D.N.M. July 12, 2005) ............................................. 17

*Moriarty v. Bd. of Cty. Commissioners for Cty. of Sandoval*,
    931 F. Supp. 2d 1142 (D.N.M. 2013) ...................................................... 16

*Pakootas v. Teck Cominco Metals, Ltd.*,
    2016 WL 4258929 (E.D. Wash. Aug. 12, 2016) ........................................................ 17

*Ralston v. Smith & Nephew Richards, Inc.*,
    275 F.3d 965 (10th Cir. 2001) ...................................................................... 13

*Republican Party of New Mexico v. Balderas*,
    2021 WL 5578869 (D.N.M. Nov. 30, 2021) ................................................. 3

*Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) ........................................... 2, 16

*Taber v. Allied Water Sys., Inc.*,
    642 F. App'x 801 (10th Cir. 2016) .......................................................... 2, 8

*United States v. Larry*,
    522 F.2d 264 (10th Cir. 1975) ................................................................. 2, 14

*United States v. Mercado-Gracia*,
    2018 WL 3458357 (D.N.M. July 18, 2018) ................................................ 14

*United States v. Rodriguez-Flores*,
    907 F.3d 1309 (10th Cir. 2018) ............................................................... 14

*United States v. Simpson*,
    7 F.3d 186 (10th Cir. 1993) ...................................................................... 16

*Wilson v. Muckala*,
    303 F.3d 1207 (10th Cir. 2002) ............................................................... 14

*Wurm v. Ford Motor Co.*,
    849 F. App'x 766 (10th Cir. 2021) .......................................................... 9

## **Statutes**

42 U.S.C. § 9607 ........................................................................................ 17

Fed. R. Evid. 702 ........................................................................... 2, 3, 8, 15

Pursuant to Federal Rule of Evidence 702 and the Court's Order Extending Daubert Motion Deadline (Dkt. 1522), the Navajo Nation hereby moves to exclude the testimony of Dr. Robin Cantor, an expert jointly retained by Defendants Environmental Restoration, LLC ("ER"), Weston Solutions, Inc. ("Weston"), and the United States Environmental Protection Agency ("USEPA"). Pursuant to D.N.M.LR-Civ. 7.1(a), the Navajo Nation determined that this motion will be opposed.

## **INTRODUCTION**

In August 2015, Defendants USEPA, Weston, and ER recklessly caused a blowout at the Gold King Mine (the "Spill"). The Spill released millions of gallons of toxic acid mine drainage into rivers upstream of the Navajo Nation, eventually contaminating the San Juan River with heavy metals at levels far beyond water quality standards. The Navajo Nation retained two expert witnesses—Dr. Ann Shellenbarger Jones and Robert Unsworth—to analyze the harms suffered by the Navajo Nation because of the Spill and calculate the costs of the remedial actions necessary to ameliorate those harms. Dr. Jones and Mr. Unsworth issued an expert report discussing their analysis and calculating the total costs of the remedial actions to be about $81 million. (*See* **Ex. 3** [Jones-Unsworth Report] at 2–4.)

Defendants jointly retained Dr. Robin Cantor as a rebuttal witness to the Jones-Unsworth Report. In her report, Dr. Cantor offers several criticisms of the analyses described in the Jones-Unsworth Report, claiming that those analyses are "[s]peculative and [u]nreliable." (**Ex. 1** [Cantor Rebuttal Report] at 33.) But Dr. Cantor's rebuttal opinions do not meet the threshold requirements of Federal Rule of Evidence 702 and *Daubert*, and thus should be excluded.

*First*, Dr. Cantor offers opinions on subjects far beyond her expertise. The harms identified in the Jones-Unsworth Report, and the remedial actions necessary to redress those harms, depend

in large part on understanding the San Juan River's vital significance in the spiritual, cultural, and economic life of the Navajo Nation.  But at deposition, Dr. Cantor conceded multiple times that she lacks any expertise in those areas.  Despite that lack of expertise, Dr. Cantor contends that the Jones-Unsworth Report failed to establish "a relationship between the environmental and cultural impacts of the [Spill] and the restorative programs" identified by Dr. Jones and Mr. Unsworth. (**Ex. 1 ¶** 51.)  Because Dr. Cantor is unqualified to render this opinion, it should be excluded.  *See Taber v. Allied Water Sys., Inc.*, 642 F. App'x 801, 807–08 (10th Cir. 2016) (excluding expert who "lacked specific knowledge and expertise in the area" relevant to the expert's analysis).

*Second*, Dr. Cantor offers opinions that will not "help the trier of fact."  Fed. R. Evid. 702(a).  For example, Dr. Cantor claims that Dr. Jones and Mr. Unsworth lack the qualifications or experience necessary to support their opinions.  But an expert may not testify about the qualifications of another expert.  *See United States v. Larry*, 522 F.2d 264, 266 (10th Cir. 1975) ("[A] direct question posed to one expert as to the qualifications of another expert [i]s improper.").  Such testimony "amounts to attacking the expert's credibility, not their substantive opinions," which is not helpful to the jury.  *Kehler v. Bridgestone Ams. Tire Operations, LLC*, 2016 WL 8316771, at *3 (D. Wyo. Dec. 1, 2016).  Dr. Cantor also opines on the purported legal basis for the Navajo Nation's damages, suggesting that the remedies discussed in the Jones-Unsworth Report are available only under CERCLA or as Natural Resource Damages, rather than tort damages.  Not only are Dr. Cantor's opinions substantively wrong; they are also improper legal opinions that should be excluded.  *See Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) (expert testimony that tries "to direct the jury's understanding of the legal standards upon which their verdict must be based . . . cannot be allowed.").

For these reasons and those developed below, the Navajo Nation respectfully requests that the Court exclude Dr. Cantor's opinions offered to rebut the Jones-Unsworth Report.

## **LEGAL STANDARD**

"Federal Rule of Evidence 702 controls the admission of expert witness testimony." *Republican Party of New Mexico v. Balderas*, 2021 WL 5578869, at *1 (D.N.M. Nov. 30, 2021) (Johnson, J.). "This rule 'imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Balderas*, 2021 WL 5578869, at *2 (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003)).

To fulfill that obligation, a district court must first determine whether the expert is qualified to render the opinions offered. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). "[T]he qualifications necessary to opine in a given case depend on the issues in that case. In other words, the question before the Court is whether the specific issues to be addressed by the expert fall within the 'reasonable confines of [the expert's] subject area.'" *Am. Auto. Ins. Co. v. First Mercury Ins. Co.*, 2017 WL 4410780, at *3 (D.N.M. Sept. 30, 2017) (citation omitted). The proponent of an expert's testimony has the "burden to 'connect the proverbial dots' between the expert's general expertise and the issues pertinent to the case.'" *Id.* (quoting *Conroy*, 707 F.3d at 1169).

After assessing an expert's qualifications, the Court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Conroy*, 707 F.3d at 1168. Once again, "the proponent of [the] expert testimony bears the burden of showing that the testimony is admissible." *Id.*

## FACTUAL BACKGROUND

### I.    Plaintiffs' Experts Calculate Damages Caused by the Spill

In this case, the Navajo Nation alleges that Defendants recklessly caused an unprecedented environmental disaster when they blew out the Gold King Mine ("GKM") and released at least three million gallons of toxic acid mine drainage into waters upstream of the Navajo Nation.  (Dkt. 7.)  The Spill contaminated the San Juan River—a sacred and critical resource to the Navajo Nation—with heavy metals, and the Navajo Nation was forced to close irrigation canals and warn its people not to use any of the river's water.  (**Ex. 3** at 7–8.)  The Spill also deposited those contaminants in riverbeds upstream from and within the Navajo Nation, which may be reanimated during rainfall or snowmelt.  (*See id.* at 9–10.)  In other words, the Spill caused immediate injury to the Navajo Nation and threatens continued injuries if the results of the Spill are left unaddressed.

The Jones-Unsworth Report identifies and quantifies the harms suffered by the Navajo Nation because of the Spill.  (*Id.* at 2–4.)  Dr. Jones has extensive experience conducting "assessment[s] of injuries to natural resources and the services they provide."  (*Id.* at 4.)  Mr. Unsworth is a leading expert in analyzing "environmental damage claims and other matters involving natural resources," with particular experience "work[ing] with numerous tribal communities in the U.S."  (*Id.* at 5.)  In forming their opinions in this case, Dr. Jones and Mr. Unsworth also consulted Dr. Adam Stack—an anthropologist specializing in Native American issues (*see id.* at 2, 25–26); Dr. Karletta Chief—a Navajo member holding a Ph.D. in hydrology water resources (*see id.* at 9, 24–25, 34–35, 38); and Ramona Antone-Nez—director of the Navajo Epidemiology Center (*see id.* at 26–27, 38).

Together, Dr. Jones and Mr. Unsworth analyzed the critical role the San Juan River plays in the spiritual, cultural, and economic life of the Navajo Nation and, based on that analysis, identified significant harms resulting from the Spill.  (*See id.* at 2–4.)  The Jones-Unsworth Report quantifies four categories of costs the Navajo Nation must incur to remedy those harms.  First, the Navajo Nation must establish "[a] Navajo-led environmental monitoring and assessment program" so that tribal members may have "confidence in the health of the San Juan River."  (*Id.* at 31–36.)  At minimum, that program must include "[l]ong-term sampling and monitoring efforts," agricultural assessments, "real-time" monitoring stations, environmental education for tribal members, and a dedicated "scientific support team."  (*Id.*)  The Jones-Unsworth Report estimates the cost of this program will be $17.3 million.  (*Id.* at 4.)

Second, because the contaminants deposited in the San Juan River by the Spill will likely be reanimated during heavy rain or snowmelt, the Navajo Nation must create "an alternative water supply system" to ensure "water surety."  (*Id.* at 36–37.)  This water supply system would enable "portions of the Navajo Nation that rely on water from the San Juan River" to have continued access to the water they need when water from the San Juan River is unusable because of reanimation of the contaminants introduced by the Spill.  (*Id.*)  The Jones-Unsworth Report estimates the cost of the water surety program to be $54.1 million.  (*Id.* at 4.)

Third, the Navajo Nation must establish restorative health programs to remedy the harms to tribal members' "culture, spirituality, and mental health caused by the Spill."  (*Id.* at 37–39.)  These restorative health programs would require the Navajo Nation to conduct repeated "needs assessments" of those affected by the Spill and establish resources within the community to

support the mental health of tribal members.  (*Id.*)  The Jones-Unsworth Report estimates the cost of these programs will be $8.3 million.  (*Id.* at 4.)

Finally, the Navajo Nation must incur costs associated with cultural preservation "to ensure that the[] [Navajo Nation's] uses and beliefs [relating to the San Juan River] can survive the Spill and the disruptions to cultural practices it caused."  (*Id.* at 39–40.)  These costs include funding for cultural studies and certain "educational efforts" directed at tribal members.  (*Id.*)  The Jones-Unsworth Report estimates these costs to be $2.6 million.  (*Id.* at 4.)

At bottom, the Jones-Unsworth Report calculates that the costs the Navajo Nation must incur to remedy the significant harms caused by the Spill total about $81 million, representing $240 per enrolled member.  (*Id.* at 40.)  The Jones-Unsworth Report concludes that these costs "are not unreasonable given the level of harm due to the Spill" and the "profound impact on the citizens of the Navajo Nation."  (*Id.* at 40–41.)

## II.    Dr. Cantor Strays Beyond Her Expertise in Rebutting Plaintiffs' Experts

On September 10, 2021, Defendants served a rebuttal report from Dr. Cantor.  (**Ex. 1**.)  In her report, Dr. Cantor offered two primary critiques of the Jones-Unsworth Report: (1) the Jones-Unsworth Report "failed to provide any methodologies or evidence to establish the level of impacts caused by the event or economic losses," and (2) the Jones-Unsworth Report "failed to identify and use" certain purportedly "longstanding . . . methodologies to establish economic harm" to the Navajo Nation resulting from the Spill.  (*Id.* ¶¶ 51–61.)  Based on those criticisms, Dr. Cantor concludes that "the Jones and Unsworth Report [i]s [s]peculative and [u]nreliable."  (*Id.* at 33.)

In reaching her conclusions, however, Dr. Cantor applies no special expertise of her own. To the contrary, Dr. Cantor admitted at deposition that the analyses conducted by Dr. Jones and

Mr. Unsworth were beyond her expertise.  She conceded that "there may be expertise [she] lack[s] to recognize whether [Dr. Jones and Mr. Unsworth] quantified th[e] relationship" between the cultural and spiritual harms suffered by the Navajo Nation because of the Spill and the remedies they assessed.  (**Ex. 2** [Cantor Tr.] at 393:18–21.)   Indeed, Dr. Cantor repeated throughout her deposition that she "do[es] not consider [her]self an expert in Native American culture" or "an expert in Navajo Nation culture."  (*Id.* at 276:1–277:7; *see, e.g.*, *id.* at 279:19–280:8 (admitting she lacks expertise "on Navajo religious or ceremonial practices" and "in the history of the Navajo people"); *id.* at 315:12–316:1 (admitting she is "not an expert" on "the cultural and social preferences and value" the Navajo Nation ascribes to the San Juan River).)  Dr. Cantor even admitted that it is "outside [her] expertise" to offer "an affirmative opinion" on "the cultural or spiritual significance of the San Juan River," "Navajo Nation culture," "Navajo Nation history," or "Navajo Nation spiritual or ceremonial practices."  (*Id.* at 318:6–17.)

Dr. Cantor's lack of relevant expertise is also apparent when examining her assessment of the specific remedies analyzed and quantified in the Jones-Unsworth Report.  For example, Dr. Cantor critiques the Jones-Unsworth Report's assertion that a long-term water sampling program is needed to measure the water quality of the San Juan River, but Dr. Cantor admits that she has "no expertise in sampling, duration, frequency, types of sampling, or sampling locations." (*Id.* at 370:3–9.)  Similarly, despite criticizing the Jones-Unsworth Report's discussion of a water surety program, Dr. Cantor conceded that she would need to consult "someone with an appropriate technical background" before she could offer an opinion "valuing what water surety program will be justified as an emergency contingency water supply."  (*Id.* at 394:12–20.)  Because she did not consult any such expert in this case, Dr. Cantor admitted she has "no alternative proposal to" the

water surety program discussed in the Jones-Unsworth Report.  (*Id.* at 396:16–20.)  The same is true of Dr. Cantor's assessment of the restorative health programs analyzed by Dr. Jones and Mr. Unsworth.  In that context, Dr. Cantor conceded she would need to consult an "appropriate team of technical experts" before she could opine on the "design [of] a program to address health impacts and restore health to a group of [] individuals."  (*Id.* at 398:9–14.)  And yet, unlike Dr. Jones and Mr. Unsworth, Dr. Cantor did not consult any such experts for purposes of her analysis in this case.  (*Id.* at 398:15–24.)

Despite Dr. Cantor's lack of expertise in these relevant areas, Dr. Cantor persists in her opinion that the Jones-Unsworth Report includes "unsupported subjective analysis of what remedial measures are required" because Dr. Jones and Mr. Unsworth "haven't quantified the relationship between the harm caused and the actions presented."  (*Id.* at 394:4–11.)

## ARGUMENT

### I.     Dr. Cantor Offers Opinions Outside Her Expertise.

Federal Rule of Evidence 702 requires that expert testimony be offered by someone who "is qualified as an expert by knowledge, skill, experience, training, or education" in the subject area of the testimony.  *See LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) ("To qualify as an expert, [an individual is] required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.").  It is not enough for an expert to "possess[] knowledge as to a general field"; they must instead have "specific knowledge" of the field to which the expert's opinions relate.  *Taber v. Allied Water Sys., Inc.*, 642 F. App'x 801, 807 (10th Cir. 2016).  Courts thus routinely exclude expert witnesses who offer opinions

beyond the expert's specific field of expertise.  *See, e.g.*, *id.* at 807–08 (excluding expert from

testifying about the cause of the plaintiff's fall from a ladder because, despite conducting about

"one thousand investigations and evaluations of injury-producing accidents," the expert "lacked

specific knowledge and expertise in the area of ladder design and ladder-accident investigation");

*Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC*, 2006 WL 4060665, at *7, 14–15 (D.N.M.

Sept. 26, 2006) (excluding expert from testifying about "the specific manufacturing defect" in a

tire, despite his "extensive experience in the tire industry," because he lacked specific expertise

"in tire failure analysis").[1]

    As explained above, the Jones-Unsworth Report analyzes and quantifies four categories of

losses suffered by the Navajo Nation because of the Spill: environmental impacts, loss of water

surety, mental health impacts, and cultural impacts.  (**Ex. 3** at 4.)  That analysis depends in large

part on understanding the critical role the San Juan River plays in the spiritual, cultural, and

economic life of the Navajo Nation's tribal members.  (*See id.* at 2–4.)  For example, assessing

how the Spill inflicted the environmental harms suffered by the Navajo Nation requires

understanding the Navajo Nation's historical and current economic uses of the San Juan River.

(*See id.* at 31–36 (analysis of environmental impacts incorporating information relating to tribal

members' reliance on San Juan River for farming and irrigation purposes).)  Similarly, the mental

health and cultural harms suffered by the Navajo Nation cannot be understood without first

---

[1] *See also Wurm v. Ford Motor Co.*, 849 F. App'x 766, 770 (10th Cir. 2021) (affirming exclusion of expert who had only "general expertise" but lacked "specific expertise" in the relevant area); *In re Williams Securities Litig.*, 496 F. Supp. 2d 1195, 1243–45 (N.D. Okla. 2007) (excluding expert who, despite having "the *general* qualifications required to perform a discounted cash flow analysis," did "not possess the industry-specific expertise necessary . . . for a discounted cash flow analysis" in that case).

understanding the cultural and spiritual value ascribed to the San Juan River by the Navajo people. (*See id.* at 37–40.) Put simply, analyzing the causal connection between the Spill and the harms suffered by the Navajo Nation that are discussed in the Jones-Unsworth Report requires consideration of the spiritual, cultural, and economic practices of the Navajo Nation. And, as is customary in the field of environmental damage assessments relating to Native American communities, Dr. Jones and Mr. Unsworth consulted with individuals with expertise in Navajo health, culture, and history—Dr. Stack, Dr. Chief, and Ms. Antone-Nez.

Dr. Cantor has none of this expertise, nor did she consult with others who do. By her own admission, Dr. Cantor is "not an expert in Navajo Nation culture." (**Ex. 2** at 277:5–7.) She has no "expertise in the history of the Navajo people." (*Id.* at 280:2–4.) Nor is she "an expert on Navajo religious or ceremonial practices." (*Id.* at 279:23–280:1.) In fact, Dr. Cantor conceded that it was "outside [her] expertise" to "have an affirmative opinion on" the "cultural or spiritual significance of the San Juan River" to the Navajo Nation. (*Id.* at 318:6–17.)[2]

Despite her lack of relevant expertise, Dr. Cantor opines that the Jones-Unsworth Report failed to prove "a relationship between the environmental and cultural impacts of the [Spill] and the restorative programs" analyzed in the Report. (**Ex. 1** ¶ 51.) Dr. Cantor is not qualified to render that opinion. Indeed, at deposition, Dr. Cantor acknowledged that the Jones-Unsworth Report may incorporate "technical expertise that [she] couldn't appreciate" in quantifying the

---

[2] Dr. Cantor still claimed that she could "review and evaluate" the Jones-Unsworth Report's "analysis of economic losses" that is based on the spiritual and cultural significance of the San Juan River. (**Ex. 2** at 318:13–17.) That is incorrect. If Dr. Cantor is unqualified to render an affirmative opinion on these topics, she is also unqualified to render a rebuttal opinion on those same topics. Dr. Cantor's supposed dichotomy between affirmative and rebuttal opinions is unsupported. Plaintiffs are unaware of any authority that holds otherwise.

"relationship between the harms caused" by the Spill and the remedial "action[s] presented." (**Ex. 2** at 392:18–393:17; *see also id.* at 393:18–21 (Dr. Cantor conceding there "may be expertise [she] lack[s] to recognize whether [the Jones-Unsworth Report] quantified that relationship").) Dr. Cantor thus admits she is unqualified to opine that the Jones-Unsworth Report failed to establish a causal relationship between the Spill and the harms suffered by the Navajo Nation. The Court should preclude Dr. Cantor from offering that opinion at trial. *See, e.g.*, *Armeanu*, 2006 WL 4060665, at *14–15 (excluding expert whose "answers at his deposition limited his expertise"); *see also Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1133–34 (10th Cir. 2009) (affirming exclusion of expert who admitted at deposition that he was "not an expert" in the relevant subject area).

Dr. Cantor's lack of expertise not only undermines her overarching critique of the Jones-Unsworth Report; it also infects her responses to the specific remedial programs that Dr. Jones and Mr. Unsworth discuss. *First*, Dr. Cantor criticizes the Jones-Unsworth Report's calculation of $17.3 million for an environmental monitoring and assessment program to remedy the ecological impacts resulting from the Spill by opining that the Jones-Unsworth Report purportedly used "no recognized methodology" to "quantify the damages alleged" and conducted "no analysis" to "demonstrate the cost-effectiveness of the compensatory measures proposed." (Ex. 1 ¶ 53.) But Dr. Cantor admits that she has "no expertise in sampling, duration, frequency, types of sampling, or sampling locations," which were integral components to Dr. Jones and Mr. Unsworth's analysis. (**Ex. 2** at 370:3–9; *see also* **Ex. 3** at 31–36 (discussing "the duration and frequency of sampling, number of sampling locations, type of samples, and analyses completed" to remedy the environmental impacts caused by the Spill).) Dr. Cantor is thus unqualified to offer expert testimony about the sampling programs assessed in the Jones-Unsworth Report.

*Second*, Dr. Cantor contends that the Jones-Unsworth Report purportedly fails to adequately explain the "basis" for "their proposed . . . water surety program." (Ex. 1 ¶ 54.) But again, Dr. Cantor concedes that she lacks the "type of expertise" required to value a water surety program. (**Ex. 2** at 394:12–20.) Instead, she would need to consult "someone with an appropriate technical background," which she did not do in forming her opinions in this case. (*Id.* at 394:12–20, 395:18–396:9.)[3]   For that reason, Dr. Cantor has "no alternative proposal" to the Jones-Unsworth Report's discussion of the water surety program necessary to remedy the Navajo Nation's injuries. (*Id.* at 396:16–20.) Because Dr. Cantor is admittedly unqualified to present an affirmative opinion on the remedial role of a water surety program in this context, she is also unqualified to offer testimony rebutting Dr. Jones and Mr. Unsworth's opinions about that program.

*Third*, Dr. Cantor opines that the Jones-Unsworth Report's analysis of "health impacts restorative programs" is allegedly "speculative and insufficient to support any quantification of harm." (**Ex. 1** ¶ 55.) At deposition, however, Dr. Cantor admitted that she would need to consult an "appropriate team of technical experts" before she could opine on the proper "design [of] a program to address health impacts and restore health to ba group of [] individuals." (**Ex. 2** at 398:9–14.) That is exactly what Dr. Jones and Mr. Unsworth did when they consulted Ms. Antone-Nez, director of the Navajo Epidemiology Center. (*See* **Ex. 3** at 38.) But Dr. Cantor did not

---

[3] That Dr. Cantor failed to consult with anyone qualified to assess the Jones/Unsworth report's proposed reservoir is especially surprising because, after the Spill and in response to concerns expressed by the Nation, the Bureau of Reclamation ("BOR")—an agency of Dr. Cantor's client, the United States—issued a report estimating the cost of an alternative water supply. Notably, the report estimated the cost of an alternative water supply to be between $22 and $680 million, reflecting the reasonableness of Jones/Unsworth's $54.1 million estimate. (**Ex. 3** at 37; Dkt. 1549-22 [BOR Study] at 6.)

consult any such experts here.  (**Ex. 2** at 398:15–24.)  As a result, she is unqualified to opine on the propriety of the restorative health programs discussed in the Jones-Unsworth Report.

In sum, by her own admission, Dr. Cantor lacks expertise in the particular fields that underlie the Jones-Unsworth Report's analysis of the harms suffered by the Navajo Nation and the remedies necessary to alleviate those harms.  She is thus unqualified to rebut that analysis.  The Court should exercise its gatekeeping function and preclude Dr. Cantor from testifying to her rebuttal opinions at trial.  *See, e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) (affirming exclusion of expert who "conceded several times" at deposition "that she knew little—if anything—about the [relevant] subject").

## II.    Dr. Cantor Offers Unhelpful Opinions that Invade the Provinces of the Court and Jury.

Federal Rule of Evidence 702 requires exclusion of an expert's opinions unless those opinions "will help the trier of fact to understand the evidence or to determine a fact in issue."  *See, e.g.*, *Ellis v. Hobbs Police Dep't*, 472 F. Supp. 3d 1087, 1094 (D.N.M. 2020) ("To be admissible, an expert's testimony must be helpful to the trier of fact.").

Dr. Cantor offers two opinions that fail this basic requirement.  *First*, Dr. Cantor improperly attacks the credibility of Dr. Jones and Mr. Unsworth by opining that they are unqualified to offer the opinions in the Jones-Unsworth Report, rendering their analysis "speculative" and "unsupported."  (**Ex. 1** ¶¶ 51–57.)  *Second*, Dr. Cantor offers a legal opinion that the remedies discussed in the Jones-Unsworth Report "are more appropriately considered response actions under CERCLA . . . and/or Natural Resource Damages," rather than tort remedies.  (*Id.* ¶ 52 n.87.)  Because these opinions do not comply with the standard set forth in Federal Rule of Evidence 702, they should be excluded.

- 13 -

### A.   *Dr. Cantor Improperly Opines On Dr. Jones's and Mr. Unsworth's Qualifications.*

"The credibility of another [witness] is not an appropriate subject for expert opinion testimony."  *E.g.*, *United States v. Rodriguez-Flores*, 907 F.3d 1309, 1321 (10th Cir. 2018); *see also Wilson v. Muckala*, 303 F.3d 1207, 1218 (10th Cir. 2002) ("The credibility of witness testimony is a matter left to the jury and generally is not an appropriate subject for expert testimony.").  An expert's "testimony regarding the qualifications of other experts amounts to attacking the expert's credibility, not their substantive opinions."  *Kehler v. Bridgestone Ams. Tire Operations, LLC*, 2016 WL 8316771, at *3 (D. Wyo. Dec. 1, 2016).  Whether someone is qualified to serve as an expert witness is a legal determination made by a court.  *See, e.g.*, *United States v. Mercado-Gracia*, 2018 WL 3458357, at *3 (D.N.M. July 18, 2018) ("Rule 702 requires the ***trial court*** to determine whether the witness is qualified as an expert by knowledge, skill, experience, training, or education." (emphasis added)).  Once the court qualifies a proposed expert, "[i]t is then up to the jury . . . to determine [the expert's] credibility."  *Kehler*, 2016 WL 8316771, at *3.

For that reason, an expert may not opine about the qualifications of another expert.  *See, e.g.*, *United States v. Larry*, 522 F.2d 264, 266 (10th Cir. 1975) ("[A] direct question posed to one expert as to the qualifications of another expert [i]s improper."); *see also Kehler*, 2016 WL 8316771, at *3 ("[A]ny [expert] testimony addressing the credibility of opposing experts is stricken and will not be allowed."); *Frerck v. Pearson Educ., Inc.*, 2014 WL 477419, at *4 (N.D. Ill. Feb. 6, 2014) (striking expert's "attempt to undermine the credentials of" the opposing experts because that "is not proper content for an expert report").

Dr. Cantor violates these rules when she opines that Dr. Jones and Mr. Unsworth purportedly lack the qualifications necessary to offer the opinions expressed in the Jones-Unsworth

Report.  For example, in her report, Dr. Cantor states that Dr. Jones and Mr. Unsworth do not "have a medical degree or any apparent experience conducting medical diagnoses or prescribing medical treatments," which in her view "undermines completely the validity" of their analysis of health impacts restorative programs.  (**Ex. 1** ¶ 55.)  Similarly, at deposition, Dr. Cantor criticized Dr. Jones because she allegedly "has no expertise in economics."  (**Ex. 2** at 370:1–2.)  Based on her assessment of Dr. Jones's and Mr. Unsworth's qualifications, Dr. Cantor stated that they do not "have the appropriate expertise to be able to" reach their conclusions, which purportedly undermines the reliability of those conclusions.  (*Id.* at 398:15–399:21.)

Dr. Cantor's opinions relating to the qualifications of Dr. Jones and Mr. Unsworth should be excluded as improper and unhelpful to the jury.  The Court will determine whether Dr. Jones and Mr. Unsworth are sufficiently qualified—a fact Dr. Cantor concedes.  (*See id.* at 399:6–21 (discussing "what the Court should consider in determining whether another expert has credentials or appropriate expertise").)  Once the Court admits Dr. Jones and Mr. Unsworth as experts, "[i]t is then up to the jury to make its own determination regarding methodology, to determine credibility, and to decide what weight, if any, should be attributed to [Dr. Jones's and Mr. Unsworth's] testimony."  *Kehler*, 2016 WL 8316771, at *3.  As a result, Dr. Cantor's criticisms of Dr. Jones's and Mr. Unsworth's qualifications, and her corresponding conclusion that their opinions are "speculative" and "unreliable," are unhelpful and should be excluded.  Fed. R. Evid. 702(a).[4]

---

[4] Beyond the impropriety of Dr. Cantor's criticisms of the qualifications of Dr. Jones and Mr. Unsworth, those criticisms are also meritless.  Dr. Jones has considerable experience with, among other things, "the assessment and restoration of injuries due to contamination with hazardous substances."  (**Ex. 3** at 4–5.)  Mr. Unsworth "has over 35 years of experience assessing
(Continued...)

**B.**     ***Dr. Cantor Improperly Opines About the Legal Basis for Damages.***

Expert testimony that gives "mere legal conclusions without any further explanation is not helpful to the trier of fact." *Martinez v. Continental Tire the Ams., LLC*, 2020 WL 5943691, at *4 (D.N.M. Oct. 7, 2020); *see also Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) (expert testimony that tries "to direct the jury's understanding of the legal standards upon which their verdict must be based . . . cannot be allowed").  Indeed, such testimony should be excluded because it "usurps the function of the jury in deciding the facts" and "interferes with the function of the judge." *E.g.*, *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993); *see also Moriarty v. Bd. of Cty. Commissioners for Cty. of Sandoval*, 931 F. Supp. 2d 1142, 1162 (D.N.M. 2013) ("[A]n expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.").

Dr. Cantor transgresses these parameters.  In her report, Dr. Cantor criticizes the "compensatory actions identified by Dr. Jones and Mr. Unsworth" as "more appropriately considered response actions under CERCLA . . . and/or Natural Resource Damages ('NRD')," rather than tort damages.  (**Ex. 1** ¶ 52 n.87.)  In her view, the Navajo Nation cannot recover the costs calculated by the Jones-Unsworth Report under CERCLA or as NRD because "Dr. Jones and Mr. Unsworth failed completely to show any attempt to comply with economic predicates" purportedly imposed by the relevant statutes.  (*Id.*).  Dr. Cantor then opines that the "economic

---

the economic impacts of changes in community access to natural resources," including issuing publications "on the use of economics in tribal environmental damage assessment."  (*Id.* at 5.) Dr. Jones and Mr. Unsworth are thus well-qualified to render their opinions in this case.

predicate[]" imposed by CERCLA is "an analysis of cost effectiveness," while the "economic

predicate[]" for NRD is "an assessment of injury quantification."  (*Id.*)

This testimony should be excluded as improper legal opinion.  Dr. Cantor concedes that

she has no "legal training or expertise," and that she did not "discuss[] with counsel" the opinions

described above.  (**Ex. 2** at 361:2–4, 364:5–11.)  She thus has no basis to offer those opinions.  At

any rate, Dr. Cantor's legal opinions are substantively wrong.  Under Colorado law, the Navajo

Nation "is entitled to recover for those damages which naturally and probably result from the

negligence of" Defendants in an amount that will make the Navajo Nation "whole."  *Cope v.

Vermeer Sales & Serv. of Colo., Inc.*, 650 P.2d 1307, 1308 (Colo. App. 1982).  The Jones-

Unsworth Report identifies the harms suffered by the Navajo Nation resulting from the Spill and

quantifies the costs for remedial programs to make the Navajo Nation whole.  (*See* **Ex. 3** at 2–4.)

The Navajo Nation's claimed remedies are thus not limited by CERCLA or the rules governing

NRD, as Dr. Cantor claims.

Even if they were, Dr. Cantor misstates the relevant legal requirements.  CERCLA entitles

Native American tribes, unlike private litigants, to recover "*all costs* of [] remedial action incurred"

because of "a release . . . of a hazardous substance."  42 U.S.C. § 9607(a)(4)(A) (emphasis added).

Contrary to Dr. Cantor's opinion, a showing of cost effectiveness by the Navajo Nation is

unnecessary.  *See Pakootas v. Teck Cominco Metals, Ltd.*, 2016 WL 4258929, at *14 (E.D. Wash.

Aug. 12, 2016) ("CERCLA authorizes the Tribes, unlike private parties, to recover 'all costs' and

imposes no necessity requirement.").  Dr. Cantor's substantive error only reinforces the necessity

that her legal opinions be excluded.  *See Montes v. Town of Silver City*, 2005 WL 8163860, at *2

(D.N.M. July 12, 2005) ("[E]xpert testimony on . . . areas of law covered by the Court's jury

instructions is of little or no relevance . . . and raises a substantial danger of unfair prejudice, confusion of the issues, or misleading the jury[.]").[5]

## **CONCLUSION**

For all these reasons, the Court should preclude Dr. Cantor from offering testimony about (1) the purported failure of the Jones-Unsworth Report to establish a "relationship between the environmental and cultural impacts of the [Spill] and the restorative programs" (s*ee, e.g.*, **Ex. 1** ¶ 51); (2) the environmental monitoring and assessment programs described in the Jones-Unsworth Report; (3) the water surety program analyzed in the Jones-Unsworth Report; (4) the health impacts restorative programs discussed in the Jones-Unsworth Report; (5) the expert qualifications of Dr. Jones and Mr. Unsworth; and (6) the legal basis for the remedies sought by the Navajo Nation to redress the harms caused by the Spill.

---

[5] At deposition, Dr. Cantor characterized her legal opinions as a mere "observation."  (**Ex. 2** at 361:18–20.)  Regardless of the characterization, Dr. Cantor's testimony about the legal framework should be excluded for the reasons explained above.

Respectfully submitted,

Dated: June 17, 2022          _/s/ Andrew K. Walsh_   _
                             John C. Hueston
                             Moez M. Kaba
                             Andrew K. Walsh
                             Joseph W. Crusham
                             HUESTON HENNIGAN LLP
                             523 West Sixth Street, Suite 400
                             Los Angeles, CA 90014

                             NAVAJO NATION DEPARTMENT OF
                             JUSTICE
                             Paul Spruhan
                             Office of the Attorney General
                             P.O. Box 2010
                             Window Rock, AZ 86515

                             Attorneys for Plaintiff
                             THE NAVAJO NATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2022, the foregoing document was filed via the U.S. District Court of New Mexico's CM/ECF electronic filing system and a copy thereof was served via the CM/ECF electronic transmission upon all counsel of record, as reflected by the Court's CM/ECF system.

*/s/   Andrew K. Walsh*